REED *v.* THE YAKA ET AL.

No. 509.   Argued April 22, 1963.—Decided May 27, 1963.

*Abraham E. Freedman* argued the cause and filed a brief for petitioner.

*T. E. Byrne, Jr.* argued the cause for respondents.   With him on the brief for Pan-Atlantic Steamship Corp. was *Mark D. Alspach.   Thomas F. Mount* filed a brief for The Yaka.

MR. JUSTICE BLACK delivered the opinion of the Court.

Petitioner, a longshoreman, filed a libel *in rem* in a United States District Court against the steamship *Yaka* to recover for injuries he sustained while engaged in loading the vessel.   The *Yaka's* owner, Waterman Steamship Corporation, appeared as claimant of the ship but brought in as an additional defendant petitioner's employer, Pan-

Atlantic Steamship Corporation, which at the time of the accident was operating Waterman's ship under a bareboat charter and whose negligence Waterman alleged caused petitioner's injury. The district judge found that at the time of the injury petitioner was in the ship standing on a stack of rectangular, wooden pallets used in loading the vessel and that the sole cause of the injury was a latent defect in one of the planks of a pallet, which caused it to break. The judge held that the defective pallet supplied by Pan-Atlantic rendered Waterman's *Yaka* unseaworthy and that therefore petitioner could recover against the ship. But since the defective pallet was furnished by Pan-Atlantic, the trial judge went on to hold that it must make Waterman whole because of an indemnity clause in the bareboat charter agreement. 183 F. Supp. 69. The Court of Appeals for the Third Circuit reversed the judgment, holding that neither Waterman nor Pan-Atlantic could be held personally liable for the unseaworthiness and that a libel *in rem* against a ship could not be sustained unless there was an underlying personal liability to support the *in rem* action. 307 F. 2d 203. Having previously reserved in *Guzman* v. *Pichirilo,* 369 U. S. 698, 700 n. 3 (1962), the question of whether personal liability is essential to the liability of a ship, we granted certiorari. 371 U. S. 938.

In determining that there was no underlying personal liability for the unseaworthiness of the vessel, the Court of Appeals held that (1) Waterman, the actual owner, could not be made to respond in damages because the unseaworthiness of its ship arose after it had been demised under bareboat charter to Pan-Atlantic,[1] and (2) Pan-

---

[1] Whether a bareboat charter absolves the owner from liability on its warranty of seaworthiness is a question we also reserved in *Guzman* v. *Pichirilo,* 369 U. S. 698, 700 (1962). We do not reach that question here.

Counsel state that an *in personam* complaint against Waterman was dismissed and no appeal was taken by petitioner. But this has no relevancy here.

Atlantic could not have been held personally liable in damages to petitioner for the unseaworthiness because Pan-Atlantic was petitioner's employer under the Longshoremen's and Harbor Workers' Compensation Act,[2] and, while that Act permits actions for damages against third persons,[3] it provides that compensation liability of an employer under the Act is exclusive and in place of all other liability on his part.[4]

We find it unnecessary to decide whether a ship may ever be held liable for its unseaworthiness where no personal liability could be asserted because, in our view, the Court of Appeals erred in holding that Pan-Atlantic could not be held personally liable for the unseaworthiness of the ship which caused petitioner's injury.

Pan-Atlantic was operating the *Yaka* as demisee or bareboat charterer from Waterman. Under such arrangements full possession and control of the vessel are delivered up to the charterer for a period of time.[5] The ship is then directed by its Master and manned by his crew; it makes his voyages and carries the cargo he chooses. Services performed on board the ship are primarily for his benefit. It has long been recognized in the law of admiralty that for many, if not most, purposes the bareboat charterer is to be treated as the owner,[6] generally called owner *pro hac vice*. We have no doubt, and indeed Pan-Atlantic admits,[7] that, barring explicit statutory exemption, the bareboat charterer is personally liable for

---

[2] 44 Stat. 1424 (1927), 33 U. S. C. §§ 901–950.

[3] 33 U. S. C. § 933.

[4] 33 U. S. C. § 905.

[5] See *Guzman* v. *Pichirilo,* 369 U. S. 698, 699–700 (1962), and cases there cited; Gilmore and Black, The Law of Admiralty (1957), 215.

[6] See, *e. g., Leary* v. *United States,* 14 Wall. 607, 610 (1872); *United States* v. *Shea,* 152 U. S. 178 (1894).

[7] Pan-Atlantic states in its brief, "Whether we call him bareboat charterer, owner *pro hac vice,* or demisee, it is he who 'is the warrantor of seaworthiness.'"

the unseaworthiness of a chartered vessel,[8] and that this liability will support a libel *in rem* against the vessel.[9] Since the unseaworthiness of the *Yaka* is no longer in dispute, the only question is whether the Longshoremen's Act prevents recovery by petitioner for Pan-Atlantic's breach of its warranty of seaworthiness.

In *Seas Shipping Co. v. Sieracki*, 328 U. S. 85 (1946), we held that a shipowner's warranty of seaworthiness extended to a longshoreman injured while loading the ship, even though the longshoreman was employed by an independent contractor. In doing so, we noted particularly the hazards of marine service, the helplessness of the men to ward off the perils of unseaworthiness, the harshness of forcing them to shoulder their losses alone, and the broad range of the "humanitarian policy" of the doctrine of seaworthiness, which we held not to depend upon any kind of contract. 328 U. S., at 93–95. We further held that the Longshoremen's and Harbor Workers' Act was not intended to take away from longshoremen the traditional remedies of the sea, so that recovery for unseaworthiness could be had notwithstanding the availability of compensation. Ten years later, in *Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp.*, 350 U. S. 124 (1956), we were faced with the question of whether a shipowner who was forced to pay damages to a longshoreman injured by the unsafe storage of cargo could recover indemnity from the stevedoring company for whom the longshoreman worked. Even in the absence of an indemnity provision, the Court held that the stevedoring company was liable over to the shipowner because it had promised to store the cargo safely. The Court was not convinced by arguments that its result made the eco-

---

[8] Cf. *Cannella v. Lykes Bros. S. S. Co.*, 174 F. 2d 794 (C. A. 2d Cir. 1949); *Cannella v. United States*, 179 F. 2d 491 (C. A. 2d Cir. 1950).

[9] See, *e. g., Crumady v. The Joachim Hendrik Fisser*, 358 U. S. 423 (1959).

nomic burden of the longshoreman's recovery fall on the stevedoring employer contrary to the purpose of the Act. Thus, there can be no doubt that, if the petitioner here had been employed to do this particular work by an independent stevedoring company rather than directly by the owner, he could have recovered damages for his injury from the owner who could have then under *Ryan* shifted the burden of the recovery to petitioner's stevedoring employer. Yet the Court of Appeals held, and Pan-Atlantic would have us hold, that petitioner must be completely denied the traditional and basic protection of the warranty of seaworthiness simply because Pan-Atlantic was not only the owner *pro hac vice* of the ship but was also petitioner's employer. In making this argument, Pan-Atlantic has not pointed and could not point to any economic difference between giving relief in this case, where the owner acted as his own stevedore, and in one in which the owner hires an independent company. In either case, under *Ryan,* the burden ultimately falls on the company whose default caused the injury. Pan-Atlantic relies simply on the literal wording of the statute, and it must be admitted that the statute on its face lends support to Pan-Atlantic's construction. But we cannot now consider the wording of the statute alone. We must view it in the light of our prior cases in this area, like *Sieracki, Ryan,* and others, the holdings of which have been left unchanged by Congress. In particular, we pointed out several times in the *Sieracki* case, which has been consistently followed since,[10] that a shipowner's obligation of seaworthiness cannot be shifted about, limited, or escaped by contracts or by the

---

[10] See, *e. g., Pope & Talbot, Inc.,* v. *Hawn,* 346 U. S. 406 (1953); *Alaska S. S. Co.* v. *Petterson,* 347 U. S. 396 (1954); *Rogers* v. *United States Lines,* 347 U. S. 984 (1954); *Crumady* v. *The Joachim Hendrik Fisser,* 358 U. S. 423 (1959).

absence of contracts and that the shipowner's obligation is rooted, not in contracts, but in the hazards of the work. And *Ryan's* holding that a negligent stevedoring company must indemnify a shipowner has in later cases been followed and to some degree extended.[11] In the light of this whole body of law, statutory and decisional, only blind adherence to the superficial meaning of a statute could prompt us to ignore the fact that Pan-Atlantic was not only an employer of longshoremen but was also a bareboat charterer and operator of a ship and, as such, was charged with the traditional, absolute, and nondelegable obligation of seaworthiness which it should not be permitted to avoid. We have previously said that the Longshoremen's Act "must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results."[12] We think it would produce a harsh and incongruous result, one out of keeping with the dominant intent of Congress to help longshoremen,[13] to distinguish between liability to longshoremen injured under precisely the same circumstances because some draw their pay directly from a shipowner and others from a stevedoring company doing the ship's service. Petitioner's need for protection from unseaworthiness was neither more nor less than that of a longshoreman working for a stevedoring company. As we said in a slightly different factual context, "All were subjected to the same danger. All were entitled to like treatment under law."[14] We conclude that petitioner was not barred by the Long-

---

[11] See, *e. g., Weyerhaeuser S. S. Co.* v. *Nacirema Operating Co.,* 355 U. S. 563 (1958); *Crumady* v. *The Joachim Hendrik Fisser,* 358 U. S. 423 (1959); *Waterman S. S. Corp.* v. *Dugan & McNamara, Inc.,* 364 U. S. 421 (1960).

[12] *Voris* v. *Eikel,* 346 U. S. 328, 333 (1953).

[13] See S. Rep. No. 973, 69th Cong., 1st Sess. (1926); H. R. Rep. No. 1190, 69th Cong., 1st Sess. (1926).

[14] *Pope & Talbot, Inc.,* v. *Hawn,* 346 U. S. 406, 413 (1953).

shoremen's Act from relying on Pan-Atlantic's liability as a shipowner for the *Yaka's* unseaworthiness in order to support his libel *in rem* against the vessel.

*Reversed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, dissenting.

This decision goes further than anything yet done by the Court in F. E. L. A. and admiralty cases (see, *e. g.,* *Rogers* v. *Missouri Pac. R. Co.,* 352 U. S. 500, and its offspring, and *Gutierrez* v. *Waterman S. S. Corp.,* ante, p. 206) to do what it considers "justice" to those who have become the unfortunate victims of industrial accidents. For it is no exaggeration to say that in holding that a longshoreman may recover from his own employer for injuries suffered in the course of employment, the Court has effectively "repealed" a basic aspect of the Longshoremen's and Harbor Workers' Compensation Act.

The violence done to the statutory scheme is most simply shown merely by quoting the relevant portions of the two provisions that govern the question before us. The first is the definition of "employer" as:

> "an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock)." § 2 (4), 44 Stat. 1425, 33 U. S. C. § 902 (4).

The second is § 5, a provision entitled "Exclusiveness of liability," which states:

> "The liability of an employer [for the compensation] prescribed in section 4 shall be exclusive and in place of all other liability of such employer to the employee . . . at law or in admiralty on account of such injury or death . . . ." 44 Stat. 1426, 33 U. S. C. § 905.

There being no doubt that petitioner is an "employee" within the meaning of the Act,[1] there is thus no question that he is excluded from recovering from his employer, Pan-Atlantic, in this action. Under a statute which was specifically written to include shipowners who employed their own dockworkers, and which excluded liability at law *or in admiralty,* there is no room for concluding that an employer shipowner can be held liable to his own longshoreman employee for unseaworthiness. Indeed, the point is so clear that petitioner has had what I would have thought was the good sense not even to argue to the contrary. (He has instead based his argument wholly on the theory that the ship itself may be liable even in the absence of any underlying personal liability on the part of anyone.)

While conceding that the statute "on its face lends support" to the conclusion that neither party has challenged, the Court refuses to give what it describes as "blind adherence to the superficial meaning" of the Act. But if exclusiveness of liability is the "superficial" meaning, then what, may it be asked, is the "true" congressional purpose in enacting this legislation? The statutory design was nowhere more concisely or more accurately summarized than in the dissenting opinion in *Ryan Stevedoring Co.* v. *Pan-Atlantic S. S. Corp.,* 350 U. S. 124, 140, where it was stated:

> "Congress weighed the conflicting interests of employers and employees and struck what was considered to be a fair and constitutional balance. Injured employees thereby lost their chance to get large tort verdicts against their employers, but gained the right to get a sure though frequently a more modest recovery. However, § 33 did leave employees a chance to

[1] The Act in § 2 (3), 44 Stat. 1425, 33 U. S. C. § 902 (3), defines "employee," and excludes only masters and members of a crew and those engaged to load or unload any small vessel under 18 tons net.

recover extra tort damages from third persons who negligently injured them. And while Congress imposed absolute liability on employers, they were also accorded counterbalancing advantages. They were no longer to be subjected to the hazards of large tort verdicts. Under no circumstances were they to be held liable to their own employees for more than the compensation clearly fixed in the Act. Thus employers were given every reason to believe they could buy their insurance and make other business arrangements on the basis of the limited Compensation Act liability." (Footnote omitted.)

Congress, then, deliberately gave employers certain "counterbalancing advantages" in exchange for imposing on them absolute liability. If these advantages are to be discarded as purely "superficial," then the true purpose of the statute was apparently to give an *additional* remedy to employees while not requiring them to relinquish any existing remedies as part of the bargain. This, of course, is precisely the opposite of what Congress explicitly aimed to do.

The Court is frank to admit that the real reason for its decision is that a contrary result would make little economic sense after the decision in *Ryan, supra,* holding that, on the basis of an implied contract of indemnity, a shipowner is entitled to reimbursement from an independent stevedore of a judgment obtained against the shipowner by the stevedore's employee. Admittedly, the liability imposed in *Ryan* is similar to the liability imposed on Pan-Atlantic in the present case. But what is overlooked is that the *Ryan* result can be squared with the statute, resting as it did on the stevedoring company's voluntarily assumed contractual obligation to indemnify the third-party shipowner, while the present result cannot. Granting that petitioner could have recovered in this case for faulty equipment brought aboard by longshoremen if the ship had been operated by an independ-

ent company, cf. *Alaska S. S. Co. v. Petterson,* 347 U. S. 396, I believe that any anomaly between that case and this one should be left to Congress to remedy, for it may be that it would choose means wholly different from those chosen by the Court. There is an outer limit beyond which judicial construction of the language of a statute ought not go, and I respectfully submit that that limit has been exceeded here.

Believing that there is no basis on which recovery by petitioner can be sustained,[2] I would affirm the judgment below.

---

[2] The basis of recovery urged by petitioner is that *in rem* liability of the ship can exist even without any underlying personal liability. But I fully agree with the court below (cf. *Guzman v. Pichirilo,* 369 U. S. 698, 704 (dissenting opinion)) that such a result would be a gross misapplication of a fiction whose principal modern function is as a procedural device to provide a convenient forum where none would otherwise be available. See *Continental Grain Co. v. Barge FBL-585,* 364 U. S. 19, 23–24. The reasons against its application to create substantive liability were eloquently stated by Mr. Justice Bradley, speaking for the Court in *City of Norwich,* 118 U. S. 468, 503: "To say that an owner is not liable, but that his vessel is liable, seems to us like talking in riddles. . . . In the matter of liability, a man and his property cannot be separated . . . ."

The Court also suggests that there may be another basis for recovery that is not reached apparently on the ground that it was not properly preserved: that Waterman, the demisor, was not absolved by the making of a bareboat charter from liability for unseaworthiness arising after the demise. I see no procedural barrier to consideration of this theory as possible support for petitioner's recovery against the ship, but I do not believe it can be sustained on its merits. I agree with the court below, and with the Court of Appeals for the Second Circuit, see *Grillea v. United States,* 229 F. 2d 687, 690, that a demisor should not be held liable for unseaworthiness resulting solely from the equipment brought on board by the demisee's employees. An analogy may concededly be drawn to this Court's holding in *Alaska S. S. Co. v. Petterson, supra,* relating to the shipowner's liability for equipment brought on board by a stevedore, but I would not extend that one-sentence 6–3 *per curiam* decision beyond its precise facts. Cf. *Gutierrez v. Waterman S. S. Corp., supra,* at 216 (dissenting opinion).